**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JIMMIE RAY HALE, JR., individually and on behalf of all others similarly situated, | Case No.  2:24-cv-3885 |
| Plaintiff, | **CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| RITE AID CORPORATION, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Jimmie Ray Hale, Jr. ("Plaintiff") brings this Class Action Complaint against Rite Aid Corporation ("Rite Aid" or Defendant), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to his own actions and their counsels' investigations, and upon information and good faith belief as to all other matters, as follows:

## INTRODUCTION

1.      Plaintiff brings this class action lawsuit against Defendant for its failure to properly secure and to safeguard the personally identifiable information ("PII") for approximately 2.2 million people.[1]

2.      On or about June 6, 2024, Rite Aid learned that "an unknown third party impersonated a company employee to compromise their business credentials and gain access to certain business systems" ("the Data Breach"). *Id.* Following an investigation of the breach, Rite Aid determined that "certain data associated with the purchase or attempted purchase of specific

---

[1] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/c4bace65-85df-4fff-b99f-f8fd390bb41a.html ("Maine AG Filing") (last visited July 31, 2024).

retail products was acquired by the unknown third party. This data included purchaser name, address, date of birth and driver's license number or other form of government-issued ID presented at the time of a purchase between June 6, 2017, and July." *Id.*

3.     On July 15, 2024, Rite Aid filed a Data Breach Notification with the Maine Attorney General's Office ("Maine AG Filing"), which disclosed:

> On June 6, 2024, an unknown third party impersonated a company employee to compromise their business credentials and gain access to certain business systems. We detected the incident within 12 hours and immediately launched an internal investigation to terminate the unauthorized access, remediate affected systems and ascertain if any customer data was impacted.
>
> . . . .
>
> We determined by June 17, 2024, that certain data associated with the purchase or attempted purchase of specific retail products was acquired by the unknown third party. This data included purchaser name, address, date of birth and driver's license number or other form of government-issued ID presented at the time of a purchase between June 6, 2017, and July 30, 2018. To confirm, no Social Security numbers, financial information or patient information was impacted by the incident.[2]

4.     Rite Aid, in its Maine AG Filing, acknowledges that Plaintiff's and Class Members' PII was unlawfully accessed and exfiltrated.

5.     Despite learning of the Data Breach "within 12 hours" of the unauthorized access on June 6, Rite Aid did not begin sending notice out to impacted individuals until July.

6.     Rite Aid has not yet disclosed details about the nature of the attack.

7.     Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Rite Aid's inadequate safeguarding of Class Members' PII that it collected and maintained, and for failing to provide adequate notice to Plaintiff and Class Members.

---

[2] *Id.*

## PARTIES

### A.  Plaintiff Jimmie Ray Hale, Jr.

8.      Plaintiff Jimmie Ray Hale, Jr. at all relevant times was and is a resident and citizen of Apple Valley, California.

9.      Plaintiff Hale's PII was in the possession and control of Defendant at the time of the Breach.

10.     In or around July 2024, Defendant notified Plaintiff Hale that the Defendant's network had been accessed and Plaintiff's PII may have been involved in the Data Breach.

11.     As a result of the Data Breach, Plaintiff Hale spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, fielding spam emails and calls daily, and monitoring his financial accounts for fraudulent activity.

12.     Even with the best response, the harm caused to Plaintiff Hale cannot be undone.

13.     Defendant admits that Plaintiff Hale's PII was exfiltrated by criminal third-parties. Thus, Plaintiff Hale's and Class Members' information is already being misused by cybercriminals.

14.     Plaintiff Hale has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties and possibly criminals. Moreover, the value of Plaintiff Hale's PII has been diminished as a result of it being exfiltrated by criminal third-parties during the Data Breach.

### B.  Defendant Rite Aid Corporation

15.     Defendant Rite Aid Corporation is a Delaware Corporation with its principal place

of business located at 1200 Intrepid Ave., 2nd Floor, Philadelphia, PA. It conducts business through several wholly owned subsidiaries.

16.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

17.     All of Plaintiff's claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## JURISDICTION & VENUE

16.     This Court has subject matter jurisdiction over this action further to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because: (i) the amount in controversy exceeds $5 million, exclusive of interest and costs; (ii) the number of class members exceeds 100 and (iii) minimal diversity exists because many class members, including Plaintiff Hale has different citizenship from Defendant.

17.     This Court has personal jurisdiction over Defendant because it operates and is headquartered in this District and conducts substantial business in this District.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Defendant is based in this District, maintains Plaintiff's and Class Members' PII in this District, and has caused harm to Plaintiff and Class Members in this District.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

19.     Rite Aid is a nationwide drugstore chain that was initially founded in Scranton,

- 4 -

Pennsylvania in 1962.[3] In 2022, Rite Aid moved its headquarters to the Navy Yard in Philadelphia, Pennsylvania. *Id.*

20.     As a condition of providing services, Rite Aid requires its clients to entrust it with their PII.

21.     Upon information and belief, Rite Aid collects and maintains the PII of its clients, including but not limited to their:

- name,
- address,
- phone number and email address;
- date of birth;
- driver's license information;
- demographic information;
- information relating to individual medical history;
- information concerning an individual's doctor, nurse, or other medical providers;
- medication information;
- health insurance information;
- photo identification; and
- other information that Rite Aid may deem necessary to provide its services.

22.     Because of the highly sensitive and personal nature of the information Rite Aid acquires and stores with respect to its clients, Plaintiff and Class Members reasonably expect that Rite Aid will, among other things: keep their PII confidential; comply with industry standards related to data security and PII; inform them of legal duties and comply with all federal and state laws protecting their PII; only use and release their PII for reasons that relate to providing services; and provide adequate notice to them if their PII is disclosed without authorization.

23.     Plaintiff and Class Members entrusted Rite Aid with their PII but, contrary to Rite Aid's duties, promises, and the reasonable expectations of Plaintiff and Class Members, Rite Aid implemented substandard data security practices and failed to adhere to industry standard

---

[3] https://www.riteaid.com/about-us/our-story (last visited July 31, 2024).

practices. Not only did Rite Aid maintain inadequate security to protect its systems from infiltration by cybercriminals, but it waited nearly three months to notify impacted individuals about the Data Breach.

***The Data Breach***

24.    According to the Maine AG Filing made by Rite Aid on July 15, 2024, Rite Aid learned that it was subject to a cybersecurity attack on June 6, 2024.

25.    Rite Aid discovered that the Data Breach impacted PII stored in its systems. Rite Aid did not disclose whether the impacted files were encrypted.

26.    In response, Rite Aid stated that it had "e detected the incident within 12 hours and immediately launched an internal investigation to terminate the unauthorized access, remediate affected systems and ascertain if any customer data was impacted."[4]

27.    Rite Aid did not begin sending out letters to impacted individuals until July 2024. In its letters, Rite Aid said the data from its systems includes customer's addresses, date of birth, and driver's license numbers or other form of government-issued ID information.

28.    As an entity that collects, creates, and maintains significant volumes of PII, the targeted attack was a foreseeable risk of which Rite Aid was aware and knew it had a duty to guard against.[5] This is particularly true given that Rite Aid was the target of another cyberattack less than one year earlier, on July 19, 2023.[6]

***Rite Aid Failed to Comply with FTC Guidelines***

29.    Rite Aid was prohibited by the Federal Trade Commission Act (the "FTC Act") (15

---

[4] Maine AG Filing.

[5] https://www.riteaid.com/legal/privacy-policy (last visited July 31, 2024) ("Rite Aid Privacy Policy").

[6] Maine AG Filing.

U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

30.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

31.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[7] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach. *Id.*

32.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security

---

[7]     *See* ECF No. 1-27, *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016).

measures.

33.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

34.     Rite Aid failed to properly implement basic data security practices.

35.     Rite Aid's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

36.     Rite Aid was at all times fully aware of the obligation to protect the PII of Plaintiff and Class Members. Rite Aid was also aware of the significant repercussions that would result from its failure to do so.

37.     Rite Aid's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice that violates the FTC Act.

***Rite Aid Failed to Comply with Data Security Industry Standards***

38.     Experts studying cybersecurity have determined that "[d]ata breaches are both commonplace and costly in the medical industry" and that one of the two sectors within that industry that "sit at the top of the list of the highest average cost of a data breach" is

pharmaceuticals.[8]

39.      Rite Aid is aware of the importance of safeguarding Plaintiff's and Class Members'
PII, that by virtue of its business—as a pharmaceutical company—it placed Plaintiff's and Class
Members' PII at risk of being targeted by cybercriminals.

40.      Because Rite Aid failed to implement, maintain, and comply with necessary
cybersecurity requirements, as a result, it was unable to protect Plaintiff's and Class Members'
information and confidentiality, and protect against obvious and readily foreseeable threats to
information security and confidentiality.

41.      As a proximate result of such failures, cybercriminals gained unauthorized access
to Defendant's networks and acquired Plaintiff's and Class Members' PII in the Data Breach
without being stopped.

42.      Defendant was unable to prevent the Data Breach and was unable to detect the
unauthorized access to vast quantities of sensitive and protected files containing Plaintiff's and
Class Members' PII.

43.      Commonly accepted data security standards among businesses and higher
education institutions that store personal information, such as the PII involved here, include, but
are not limited to:

---

[8]      https://securityintelligence.com/articles/cost-of-a-data-breach-2023-pharmaceutical-industry/
(last visited Mar. 1, 2024).

    a.   Maintaining a secure firewall configuration;

    b.   Monitoring for suspicious or irregular traffic to servers;

    c.   Monitoring for suspicious credentials used to access servers;

    d.   Monitoring for suspicious or irregular activity by known users;

    e.   Monitoring for suspicious or unknown users;

    f.   Monitoring for suspicious or irregular server requests;

    g.   Monitoring for server requests for personal and financial information;

    h.   Monitoring for server requests from VPNs; and

    i.   Monitoring for server requests from Tor exit nodes.

44.    The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for Cybersecurity (Start with Security: A Guide for Business, (June 2015)) and protection of personal and financial information (Protecting Personal Information: A Guide for Business, (Oct. 2016)), which includes basic security standards applicable to all types of businesses and higher education institutions.

45.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses and higher education institutions must take to meet their data security obligations.

46.    Because Defendant was entrusted with Plaintiff's and Class Members' PII, it had and have a duty to keep the PII secure.

47.    Plaintiff and Class Members reasonably expect that when they entrusted their PII

to Rite Aid.

48.     Despite Defendant's obligations, Defendant failed to appropriately monitor and maintain their data security systems in a meaningful way so as to prevent the Data Breach.

49.     Had Defendant properly maintained their systems and adequately protected them, it could have prevented the Data Breach.

***Rite Aid Violated its Common Law Duty of Reasonable Care***

50.     Rite Aid was aware of the importance of security in maintaining personal information (particularly sensitive personal information like the PII involved here), and the value consumers place on keeping their PII secure.

51.     In addition to obligations imposed by federal and state law, Defendant owed and continues to owe a common law duty to Plaintiff and Class Members—who entrusted Defendant with their PII —to exercise reasonable care in receiving, maintaining, and storing, the PII in Defendant's possession.

52.     Defendant owed and continues to owe a duty to prevent Plaintiff's and Class Members' PII from being compromised, lost, stolen, accessed, or misused by unauthorized third parties. An essential part of Defendant's duties were (and are) the obligation to provide reasonable security consistent with current industry best practices and requirements, and to ensure information technology systems and networks, in addition to the personnel responsible for those systems and networks, adequately protected and continue to protect Plaintiff's and Class Members' PII.

53.     Defendant owed a duty to Plaintiff and Class Members, who entrusted Defendant with extremely sensitive PII to design, maintain, and test the information technology systems that housed Plaintiff's and Class Members' PII, to ensure that the PII in Defendant's possession were adequately secured and protected.

54.    Defendant owed a duty to Plaintiff and Class Members to create, implement, and maintain reasonable data security practices and procedures sufficient to protect the PII stored in Defendant's systems. In addition, this duty also required Rite Aid to adequately train its employees and others with access to Plaintiff's and Class Members' PII on the procedures and practices necessary to safeguard such sensitive information. This duty also required supervision, training, and compliance on Rite Aid's part to ensure that it complied with creating, implementing, and maintaining reasonable data security practices and procedures sufficient to protect Plaintiff's and Class Members' PII.

55.    Defendant owed a duty to Plaintiff and Class Members to implement processes that would enable Defendant to timely detect a breach of its information technology systems, and a duty to act upon any data security warnings or red flags detected by such systems in a timely fashion.

56.    Defendant owed a duty to Plaintiff and Class Members to disclose when and if their information technology systems and data security practices were not sufficiently adequate to protect and safeguard Plaintiff's and Class Members' PII.

57.    Thus, Defendant owed a duty to Plaintiff and Class Members to timely disclose the fact that a data breach, resulting in unauthorized access to their PII, had occurred.

58.    Defendant violated these duties. The Notice Letter further states that Rite Aid became aware of the Data Breach on or about June 6, 2024, however, Plaintiff and Class Members, and the public did not learn of the Data Breach until over a month later and did not know whether their PII was impacted until Rite Aid sent out the notice letters in July 2024. Defendant failed to publicly describe the full extent of the Data Breach and notify affected parties. This demonstrates that Rite Aid did not properly implement measures designed to timely detect a data breach of their

information technology systems, as required to adequately safeguard Plaintiff's and Class Members' PII.

59.     Defendant also violated its duties to create, implement, and maintain reasonable data security practices and procedures sufficient to protect Plaintiff's and Class Members' PII.

60.     Rite Aid breached its obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because it failed to properly maintain and safeguard their computer systems and data. Rite Aid's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

- Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

- Failing to adequately protect customers' PII;

- Failing to properly monitor its own data security systems for existing intrusions;

- Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

- Failing to detect unauthorized ingress into its systems;

- Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within its systems, including to and from areas containing the most sensitive data;

- Failing to detect unauthorized exfiltration of the most sensitive data on its systems;

- Failing to train its employees in the proper handling of emails containing PII and maintain adequate email security practices;

- Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

- Failing to adhere to industry standards for cybersecurity as discussed above; and

- Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private PII.

61.     Rite Aid negligently and unlawfully failed to safeguard Plaintiff's and Class Members PII by allowing cybercriminals to access its computer network which contained unsecured and unencrypted PII.

62.     Had Defendant remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

63.     However, due to Rite Aid's failures, Plaintiff and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members also lost the benefit of the bargain they made with Rite Aid.

***Rite Aid Knew or Should Have Known That Criminals Target PII and the Data Breach Was Foreseeable and Preventable***

64.     Defendant was well aware that the protected PII it acquires, stores, and utilizes is highly sensitive and of significant value to the owners of the PII and those who would use it for wrongful purposes.

65.     PII is a valuable commodity to identity thieves, particularly when it is aggregated in large numbers.  Former United States Attorney General William P. Barr made clear that consumers' sensitive personal information commonly stolen in data breaches "has economic value."  The purpose of stealing large caches of personal data is to use it to defraud individuals or to place it for illegal sale and to profit from other criminals who buy the data and use it to commit fraud and identity theft. Indeed, cybercriminals routinely post stolen personal information on anonymous websites, making the information widely available to the criminal underworld.

66.     There is an active and robust market for this information. As John Sancenito, president of Information Network Associates, a company which helps companies with recovery

after data breaches, explained after a data breach "[m]ost of the time what [data breach hackers] do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."

67.     PII is a valuable property right.[9] The value of PII as a commodity is measurable.[10] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[11] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[12] PII is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

68.     As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, SSNs, PII, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

69.     The forms of PII involved in this Data Breach are particularly concerning and are

---

[9] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFORMATION AND COMMUNICATION TECHNOLOGY 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible[.]") (last visited July 6, 2023).
[10] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192 (last visited Mar. 1, 2024).
[11]   *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last visited Mar. 1, 2024).
[12]   *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/ (last visited Mar. 1, 2024).

a prime target for cybercriminals.

70.    The ramifications of Defendant's failure to keep Plaintiff's and Class Members' PII secure are long lasting and severe.  To avoid detection, identity thieves often hold stolen data for months or years before using it.  Also, the sale of stolen information on the "dark web" may take months or more to reach end-users, in part because the data is often sold in small batches as opposed to in bulk to a single buyer.  Thus, Plaintiff and Class Members must vigilantly monitor their accounts ad infinitum.

71.    Thus, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its systems were breached.  Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

72.    As a highly sophisticated party that handles sensitive PII, Defendant failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiff's and other Class Members' PII to protect against anticipated threats of intrusion of such information.

73.    Moreover, theft of PII is also gravely serious because PII is an extremely valuable property right.[13]

74.    PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

75.    There is a strong probability that entire batches of stolen information have been

---

[13] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted) (last accessed Mar. 1, 2024).

dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

76.     The PII exfiltrated in the Data Breach can also be used to commit identity theft by placing Plaintiff and Class Members at a higher risk of "phishing," "vishing," "smishing," and "pharming," which are which are other ways for cybercriminals to exploit information they already have in order to get even more personally identifying information from a person through unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

77.     There is often a lag time between when fraud occurs versus when it is discovered, as well as between when PII is stolen and when it is used. According to the *U.S. Government Accountability Office*, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

78.     Personal information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the cyber black market for years. Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[14] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[15]

---

[14] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, Nov. 15, 2017, https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web (last accessed Mar. 1, 2024).
[15] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (last accessed Mar. 1, 2024).

79.     Plaintiff and Class Members rightfully place a high value not only on their PII, but also on the privacy of that data.

80.     Thus, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to PII, they *will use it*.

81.     Data breaches are preventable. As Lucy Thompson wrote in the *Data Breach and Encryption Handbook*, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised…" and "[m]ost of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures…Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."

82.     This was a financially motivated Data Breach, as the only reason the cybercriminals go through the trouble of running a targeted cyberattack against entities like Rite Aid is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

83.     It is within this context that Plaintiff and all other Class Members must now live

with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

84.     Victims of the Data Breach, like Plaintiff and Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.

85.     As a direct and proximate result of the Data Breach, Plaintiff and Class Members have had their PII exposed, have suffered harm as a result, and have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiff and Class Members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, and credit reports for unauthorized activity for years to come.

***Defendant Knew or Should Have Known of the Risk Because Healthcare Entities In Possession of PII Are Particularly Suspectable to Cyberattacks***

86.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities that collect and store PII, like Defendant, preceding the date of the breach.

87.     Data thieves regularly target companies like Defendant's due to the highly sensitive information that they have custody of. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access. Defendant had been a target of a similar data breach less than a year before,

on July 19, 2023.[16]

88.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[17]

89.     Healthcare related breaches, in particular, have continued to rapidly increase because electronic patient data is seen as a valuable asset. In fact, entities that store patient information "have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[18]

90.     Moreover, in light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

91.     As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if their data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

---

[16] Maine AG Filing.
[17] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.
[18] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited on Aug. 5, 2023).

92.     Despite the prevalence of public announcements of data breach and data security compromises and having already been the target of another data breach so recently, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

93.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

94.     Additionally, as companies became more dependent on computer systems to run their business,[19] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[20]

95.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's servers, amounting to potentially hundreds of thousands of individuals' detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

96.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

---

[19]     https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last accessed July 31, 2024).
[20]     https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last accessed July 31, 2024).

97.     The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly PHI—fraudulent use of that information and damage to victims may continue for years.

98.     As a healthcare services company in possession of current and former patients' PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

***Plaintiff and Class Members Suffered Harm as a Result of the Data Breach***

99.     The ramifications of Defendant's failure to keep PII secure are long-lasting and severe. Victims of data breaches are more likely to become victims of identity fraud, occurring 65 percent of the time.  In 2019 alone, consumers lost more than $1.9 billion to identity theft and fraud.

100.     Besides damage sustained in the event of identity theft, consumers may also spend anywhere from approximately 7 hours to upwards to over 1,000 hours trying to resolve identity theft issues.  The Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."

101.     Plaintiff's and Class Members' PII was provided to Rite Aid in conjunction with the type of work Rite Aid performs as a pharmaceutical provider. In requesting and maintaining Plaintiff's and Class Members' PII, Rite Aid promised, and undertook a duty, to act reasonably in its handling of Plaintiff's and Class Members' PII. Rite Aid, however, did not take proper care of

Plaintiff's and Class Members' PII, leading to its exposure to and exfiltration by cybercriminals as a direct result of Rite Aid's inadequate data security measures.

102.    As a result of Rite Aid's conduct and failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect consumers' PII, which allowed the Data Breach to occur, Plaintiff's and Class Members' PII has been and is now in the hands of unauthorized individuals and third parties, which may include thieves, unknown criminals, banks, credit companies, and other potentially hostile individuals.

103.    Plaintiff and Class Members greatly value their privacy, especially their highly-sensitive information, such as their first and last names, dates of birth, addresses, and medical information. They would not have entrusted Rite Aid with this highly-sensitive information, had they known that Rite Aid would negligently fail to adequately protect their PII. Indeed, Plaintiff and Class Members provided Rite Aid with this highly-sensitive information with the expectation that Rite Aid would keep their PII secure and inaccessible from unauthorized parties.

104.    As a result of Rite Aid's failure to implement and follow even the most basic security procedures, Plaintiff and Class Members suffered actual damages including, without limitation, time and expenses related to monitoring their financial accounts for fraudulent activity, exposure to increased and imminent risk of fraud and identity theft, the loss in value of their personal information, and other economic and non-economic harm. Plaintiff and Class Members will now be forced to expend additional time to review their credit reports and monitor their financial accounts and medical records for fraud or identify theft—particularly since the compromised information may include driver's license numbers.

105.    Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class

Members will need to maintain these heightened measures for years, and possibly their entire lives.

106.    Plaintiff and Class Members are also at a continued risk of harm because their PII remains in Rite Aid's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Rite Aid fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

107.    As a result of the Data Breach, and in addition to the time Plaintiff and Class Members have spent and anticipate spending to mitigate the impact of the Data Breach on their lives, Plaintiff and Class Members have also suffered emotional distress from the public release of their PII, which they believed would be protected from unauthorized access and disclosure. The emotional distress they have experienced includes anxiety and stress resulting from the fear that unauthorized bad actors are viewing, selling, and or using their PII for the purposes of identity theft and fraud.

108.    Additionally, Plaintiff and Class Members have suffered damage to and diminution in the value of their highly sensitive and confidential PII —a form of property that Plaintiff and Class Members entrusted to Rite Aid, and which was compromised as a result of the Data Breach Rite Aid failed to prevent. Plaintiff and Class Members have also suffered a violation of their privacy rights as a result of Rite Aid's unauthorized disclosure of their PII.

## CLASS ACTION ALLEGATIONS

109.    Plaintiff brings this case individually and, pursuant to Rule 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, on behalf of the following Nationwide Class and state classes (collectively the "Class"):

**Nationwide Class**
All persons whose PII was compromised in the Data Breach that was discovered by Rite Aid on or around June 6, 2024.

In addition, or in the alternative, Plaintiff proposes the following state class:

**California Class**
All residents of California whose PII was compromised in the Data breach that was discovered by Rite Aid on or around June 6, 2024.

110.    Excluded from the Class is Rite Aid, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Rite Aid has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

111.    Plaintiff reserves the right to modify or amend the definition of the proposed Class, if necessary, before this Court determines whether certification is appropriate.

112.    The requirements of Rule 23(a)(1) are satisfied. The Class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. As noted above, there are approximately 2.2 million Class Members.

113.    The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant's records, including but not limited to, the information implicated in the Data Breach.

114.    The requirements of Rule 23(a)(2) are satisfied. There is a well-defined community of interest and there are common questions of fact and law affecting Class Members. The questions of fact and law common to the Class predominate over questions which may affect individual

members and include the following:

a.     Whether and to what extent Defendant had a duty to secure and protect the PII of Plaintiff and Class Members;

b.     Whether Defendant was negligent in collecting and disclosing Plaintiff's and Class Members' PII;

c.     Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

d.     Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;

e.     Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

f.     Whether Defendant breached its duties to exercise reasonable care in handling Plaintiff's and Class Members' PII in the manner alleged herein, including failing to comply with industry standards;

g.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.     Whether Defendant had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

i.     Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

j.     Whether Plaintiff and Class Members are entitled to declaratory judgment under 28 U.S.C. § 2201, *et seq.*;

k.      Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conducts; and

l.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

115.    The requirements of Rule 23(a)(3) are satisfied. Plaintiff's claims are typical of the claims of Class Members. The claims of the Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendant to safeguard PII. Plaintiff and Class Members each had their PII disclosed by Defendant to an unauthorized third party.

116.    The requirements of Rule 23(a)(4) are satisfied. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of Class Members and have no interests antagonistic to the Class Members. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation, including data breach litigation. The claims of Plaintiff and Class Members are substantially identical as explained above. While the aggregate damages that may be awarded to the Class Members are likely to be substantial, the damages suffered by the individual Class Members are relatively small. As a result, the expense and burden of individual litigation make it economically infeasible and procedurally impracticable for each member of the Class to individually seek redress for the wrongs done to them. Certifying the case as a class will centralize these substantially identical claims in a single proceeding, which is the most manageable litigation method available to Plaintiff and the Class and will conserve the resources of the parties and the court system, while protecting the rights of each member of the Class. Defendant's uniform conduct is generally

applicable to the Class as a whole, making relief appropriate with respect to each Class Member.

117.    Here a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court. Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendant's violations of law inflicting damages in the aggregate would go un-remedied.

118.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

        a.    Whether Defendant owed a legal duty to Plaintiff and the Classes to exercise due care in collecting, storing, using, and safeguarding their PII;

        b.    Whether Defendant's data security practices were reasonable in light of best practices recommended by data security experts;

        c.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

        d.    Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII; and

e.      Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

119.    Finally, all members of the proposed Classes are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. At least some Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the California Class)**

120.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

121.    Rite Aid owed a duty to Plaintiff and all other Class Members to exercise reasonable care in safeguarding and protecting their PII in its possession, custody, or control.

122.    Rite Aid knew, or should have known, the risks of collecting and storing Plaintiff's and all other Class Members' PII and the importance of maintaining secure systems. Rite Aid knew, or should have known, of the vast uptick in data breaches in recent years. Rite Aid had a duty to protect the PII of Plaintiff and Class Members.

123.    Given the nature of Rite Aid's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, Rite Aid should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring, which Rite Aid had a duty to prevent.

124.    Rite Aid breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt,

implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to them—including Plaintiff's and Class Members' PII.

125.    It was reasonably foreseeable to Rite Aid that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' PII to unauthorized individuals.

126.    But for Rite Aid's negligent conduct/breach of the above-described duties owed to Plaintiff and Class Members, their PII would not have been compromised.

127.    As a result of Rite Aid's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) actual or attempted fraud.

<u>COUNT II</u>
NEGLIGENCE *PER SE*
**(On Behalf of Plaintiff and the Nationwide Class, or Alternatively, the California Class)**

128.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

129.   In addition to the common law, Rite Aid's duties arise from Section 5 of the FTCA ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Rite Aid, of failing to employ reasonable measures to protect and secure PII.

130.   Rite Aid violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other Class Members' PII and not complying with applicable industry standards. Rite Aid's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiff and the other Class Members.

131.   Rite Aid's violations of Section 5 of the FTCA constitutes negligence *per se*.

132.   Plaintiff and Class Members are within the class of persons that Section 5 of the FTCA was intended to protect.

133.   The harm occurring as a result of the Data Breach is the type of harm Section 5 of the FTCA was intended to guard against.

134.   It was reasonably foreseeable to Rite Aid that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' PII to

unauthorized individuals.

135.    The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of Rite Aid's violations of Section 5 of the FTCA. Plaintiff and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) actual or attempted fraud.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the California Class)**

136.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

137.    Plaintiff and Class Members either directly or indirectly gave Rite Aid their PII in confidence, believing that Rite Aid– healthcare organizations – would protect that information. Plaintiff and Class Members would not have provided Rite Aid with this information had they known it would not be adequately protected. Rite Aid's acceptance and storage of Plaintiff's and Class Members' PII created a fiduciary relationship between Defendant and Plaintiff and Class Members. In light of this relationship, Rite Aid must act primarily for the benefit of its patients (at least insofar as it relates to the safeguarding of their PII).

138.    Rite Aid has a fiduciary duty to act for the benefit of Plaintiff and Class Members

upon matters within the scope of their relationship. It breached that duty by failing to properly protect the integrity of the system containing Plaintiff's and Class Members' PII, failing to comply with the data security guidelines set forth by Section 5 of the FTCA, and otherwise failing to safeguard the PII of Plaintiff and Class Members it collected.

139.    As a direct and proximate result of Rite Aid's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Rite Aid's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) actual or attempted fraud.

## COUNT IV
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the California Class)

140.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein. This claim is pled in the alternative to the implied contract claim pursuant to Fed. R. Civ. P. 8(d)(2).

141.    Plaintiff and Class Members conferred a monetary benefit upon Rite Aid in the form of monies paid for educational services or other services.

142.    Rite Aid accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Rite Aid also benefited from the receipt of Plaintiff's and Class Members' PII.

143.    As a result of Rite Aid's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

144.    Rite Aid should not be permitted to retain the money belonging to Plaintiff and Class Members because Rite Aid failed to adequately implement the data privacy and security procedures for themselves self that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, local laws, and industry standards.

145.    Rite Aid should be compelled to provide for the benefit of Plaintiff and Class Members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Nationwide Class or, Alternatively, the California Class)**

146.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

147.    Defendant required Plaintiff and Class Members to provide, or authorize the transfer of, their PII in order for Rite Aid to provide healthcare services. In exchange, Rite Aid entered into implied contracts with Plaintiff and Class Members in which Rite Aid agreed to comply with their statutory and common law duties to protect Plaintiff's and Class Members' PII and to timely notify them in the event of a data breach.

148.    Plaintiff and Class Members would not have provided their PII to Defendant had they known that Defendant would not safeguard their PII, as promised, or provide timely notice of

a data breach.

149.    Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendant.

150.    Defendant breached the implied contracts by failing to safeguard Plaintiff's and Class Members' PII and by failing to provide them with timely and accurate notice of the Data Breach.

151.    The losses and damages Plaintiff and Class Members sustained (as described above) were the direct and proximate result of Defendant's breach of their implied contracts with Plaintiff and Class Members.

**COUNT VI**
**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT OF 2018**
**Cal. Civ. Code §§ 1798.100 et seq. ("CCPA")**
**(On Behalf of Plaintiff and the California Class)**

152.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

153.    Plaintiff brings this claim on behalf of himself and the California Class.

154.    As more personal information about consumers is collected by businesses, consumers' ability to properly protect and safeguard their privacy has decreased. Consumers entrust businesses with their personal information on the understanding that businesses will adequately protect it from unauthorized access.

155.    As a result, in 2018, the California Legislature passed the CCPA, giving consumers broad protections and rights intended to safeguard their personal information. Among other things, the CCPA imposes an affirmative duty on certain businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected.

156.    Rite Aid is subject to the CCPA and failed to implement such procedures which resulted in the Data Breach.

157.    Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

158.    Plaintiff is a "consumer" as defined by Civ. Code § 1798.140(g) because he is natural person residing in the state of California.

159.    Rite Aid is a "business" as defined by Civ. Code § 1798.140(c).

160.    The CCPA provides that "personal information" includes "[a]n individual's first name or first initial and the individual's last name in combination with any one or more of the following data elements, when either the name or the data elements are not encrypted or redacted . . . (ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual." See Civ. Code § 1798.150(a)(1); Civ. Code § 1798.81.5(d)(1)(A).

161.    Plaintiff's PII compromised in the Data Breach constitutes "personal information" within the meaning of the CCPA.

162.    Through the Data Breach, Plaintiff's PII was accessed without authorization, exfiltrated, and stolen by criminals in a nonencrypted and/or nonredacted format

163.    The Data Breach occurred as a result of Rite Aid's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information.

164.    Simultaneously herewith, Plaintiff is providing notice to Defendants pursuant to Cal. Civ. Code § 1798.150(b)(1), identifying the specific provisions of the CCPA that Plaintiff alleges Rite Aid has violated or is violating. Although a cure is not possible under the circumstances, if (as expected) Rite Aid is unable to cure or does not cure the violation within 30 days, Plaintiff will amend this Complaint to pursue actual or statutory damages as permitted by Cal. Civ. Code § 1798.150(a)(1)(A).

165.    As a result of Rite Aid's failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, Plaintiff seeks statutory damages of up to $750 per class member (and no less than $100 per class member), actual damages to the extent they exceed statutory damages, injunctive and declaratory relief, and any other relief as deemed appropriate by the Court.

**COUNT VII**
**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**Cal. Civ. Code §§ 1750 et seq. ("CLRA")**
**(On Behalf of Plaintiff and the California Class)**

166.    Plaintiff realleges and incorporates by reference each and every allegation contained elsewhere in this Complaint as if fully set forth herein.

167.    Plaintiff brings this claim on behalf of himself and the California Class.

168.    This cause of action is brought pursuant to the California Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, et seq. This cause of action does not seek monetary damages at this time but is limited solely to injunctive relief. Plaintiff will later amend this Complaint to seek damages in accordance with the CLRA after providing Defendant with notice required by California Civil Code § 1782.

169.    Plaintiff and Class Members are "consumers," as the term is defined by California Civil Code § 1761(d).

170.    Plaintiff, Class Members and Defendant have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

171.    The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct undertaken by Defendant was likely to deceive consumers.

172.    Cal. Civ. Code § 1770(a)(5) prohibits one who is involved in a transaction from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

173.    Defendant violated this provision by representing that it took appropriate measures to protect Plaintiff's and the Class Members' PII. Additionally, Defendant improperly handled, stored, or protected either unencrypted or partially encrypted data.

174.    As a result, Plaintiff and the Class Members were induced to provide their PII to Defendant.

175.    As a result of engaging in such conduct, Defendant has violated Civil Code § 1770.

176.    Pursuant to Civil Code § 1780(a)(2) and (a)(5), Plaintiff seeks an order of this Court that includes, but is not limited to, an order enjoining Defendant from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

177.    Plaintiff and the Class Members suffered injuries caused by Defendant's misrepresentations, because they provided their PII believing that Defendant would adequately protect this information.

178.    Plaintiff and Class Members may be irreparably harmed and/or denied an effective

and complete remedy if such an order is not granted.

179.    The unfair and deceptive acts and practices of Defendant, as described above, present a serious threat to Plaintiff and members of the Class.

**COUNT VIII**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. and Prof. Code §§ 17200, et seq. ("UCL")**
**(On Behalf of Plaintiff and the California Class)**

180.    Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

181.    Plaintiff brings this claim on behalf of himself and the California Class.

182.    The California Unfair Competition Law, Cal. Bus. & Prof. Code §17200, et seq. ("UCL"), prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as defined by the UCL and relevant case law.

183.    By reason of Defendant's above-described wrongful actions, inaction, and omission, the resulting Data Breach, and the unauthorized disclosure of Plaintiff's and Class members' PII, Defendant engaged in unlawful, unfair and fraudulent practices within the meaning of the UCL.

184.    Defendant's business practices as alleged herein are unfair because they offend established public policy and are immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, in that the private and confidential PII of consumers has been compromised for all to see, use, or otherwise exploit.

185.    Defendant's practices were unlawful and in violation of the CCPA and CLRA and Defendants' own privacy policy because Rite Aid failed to take reasonable measures to protect Plaintiff's and Class members' PII.

186.    Defendant's business practices as alleged herein are fraudulent because they are

- 39 -

likely to deceive consumers into believing that the PII they provide to Defendant will remain private and secure, when in fact it was not private and secure.

187.    Plaintiff and Class Members suffered (and continue to suffer) injury in fact and lost money or property as a direct and proximate result of Defendant's above-described wrongful actions, inaction, and omissions including, inter alia, the unauthorized release and disclosure of their PII.

188.    Defendant's above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiff's and Class Members' PII also constitute "unfair" business acts and practices within the meaning of Cal. Bus. & Prof. Code § 17200 et seq., in that Defendant's conduct was substantially injurious to Plaintiff and Class Members, offensive to public policy, immoral, unethical, oppressive and unscrupulous, and the gravity of Defendant's conduct outweighs any alleged benefits attributable to such conduct.

189.    But for Defendant's misrepresentations and omissions, Plaintiff and Class Members would not have provided their PII to Defendant, or would have insisted that their PII be more securely protected.

190.    As a direct and proximate result of Defendant's above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiff and Class Members' PII, they have been injured as follows: (1) the loss of the opportunity to control how their PII is used; (2) the diminution in the value and/or use of their PII entrusted to Defendant; (3) the increased, imminent risk of fraud and identity theft; (4) the compromise, publication, and/or theft of their PII; and (5) costs associated with monitoring their PII, amongst other things.

191.    Plaintiff takes upon himself enforcement of the laws violated by Defendant in connection with the reckless and negligent disclosure of PII.  There is a financial burden incurred in pursuing this action and it would be against the interests of justice to penalize Plaintiff by forcing him to pay attorneys' fees and costs from the recovery in this action.  Therefore, an award of attorneys' fees and costs is appropriate under California Code of Civil Procedure § 1021.5.

**COUNT IX**
**VIOLATIONS OF THE CONSUMER CUSTOMER RECORDS ACT**
**Cal. Civ. Code §§ 1798.80, et seq.**
**(On Behalf of Plaintiff and the California Class)**

192.    Plaintiff repeats and alleges the foregoing allegations as if fully alleged herein.

193.    Plaintiff brings this claim on behalf of himself and the California Class.

194.    The California legislature enacted Cal. Civ. Code § 1798.81.5 "to ensure that Personal Information about California residents is protected."

195.    The California Customer Records Act, Cal. Civ. Code §§ 1798.80 et seq., requires that any business that "owns, licenses, or maintains Personal Information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the Personal Information from unauthorized access, destruction, use, modification, or disclosure."

196.    Defendant is a business that owns, maintains, and licenses Personal Information, within the meaning of Cal. Civ. Code § 1798.81.5, about Plaintiff and California Class members.

197.    Businesses that own or license computerized data that includes Personal Information are required to notify California residents when their Personal Information has been acquired, or is reasonably believed to have been acquired, by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82. Among other requirements, the breach notification must include "the types of

Personal Information that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

198.    Defendant is a business that owns or licenses computerized data that includes Personal Information as defined by Cal. Civ. Code § 1798.82.

199.    Plaintiff and the California Class members' PII includes Personal Information as covered by Cal. Civ. Code § 1798.82.

200.    Because Defendant reasonably believed that Plaintiff's and California Class members' PII was acquired by unauthorized third parties during the Data Breach, Defendant had an obligation to disclose the Data Breach in a timely and accurate fashion in accordance with Cal. Civ. Code § 1798.82.

201.    By failing to disclose the Data Breach in a timely and accurate manner, Defendant violated Cal. Civ. Code § 1798.82.

202.    As a direct and proximate result of Defendant's violations of the Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiff and California Class members suffered damages, as described herein.

203.    Plaintiff and California Class members seek relief under Cal. Civ. Code § 1798.84, including actual damages and injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff on behalf of himself and all others similarly situated, prays for relief as follows:

(a)     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(c)     For damages, including all compensatory, punitive, and/or nominal damages, in an amount to be determined by the trier of fact;

(d)      For an order of restitution and all other forms of equitable monetary relief;

(e)     Declaratory and injunctive relief as described herein;

(f)     Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses;

(g)     Awarding pre- and post-judgment interest on any amounts awarded; and

(h)     Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

A jury trial is demanded on all claims so triable.

Date: August 6, 2024                    Respectfully Submitted,

/s/ _____
Benjamin F. Johns (PA Bar 201373)
Samantha E. Holbrook (PA Bar 311829)
Andrea L. Bonner (PA Bar 332945)
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Telephone: (610) 477-8380
Fax: (856) 210-9088
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com
abonner@shublawyers.com